Rashad Ahmad Refaat EL BADRAWI, Plaintiff

v.

DEPARTMENT OF HOMELAND SECURITY, et al., Defendants.

Civil Action No. 3:07–CV–1074 (JCH).

United States District Court, D. Connecticut.

Sept. 22, 2008.

Michael J. Wishnie, Jerome N. Frank Legal Services, Hope R. Metcalf, Ramzi Kassem, Yale Law School, New Haven, CT, for Plaintiff.

Brant S. Levine, Laura K. Smith, U.S. Department of Justice, Washington, DC, Lisa E. Perkins, U.S. Attorney's Office, Maura Murphy–Osborne, Attorney General's Office, Hartford, CT, Victoria S. Shin, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendants.

**RULING RE: DEFENDANTS' MOTIONS TO DISMISS OR FOR SUMMARY JUDGMENT [Doc. Nos. 19, 22, 25, 35, 36] AND PLAINTIFF'S MOTIONS TO CONTINUE OR DENY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [Doc. Nos. 44, 46]**

JANET C. HALL, District Judge.

Plaintiff Rashad Ahmad Refaat El Badrawi brings this action against a variety

of federal and state defendants for actions surrounding his arrest and detention on suspected immigration violations. In brief, El Badrawi claims that agents of the U.S. Immigration and Customs Enforcement ("ICE") arrested him in October 2004, even though he was in a lawful immigration status. Following his arrest, El Badrawi was incarcerated in a state corrections center, where he claims that he was denied the ability to practice his religion and denied access to adequate medical care. Frustrated by his conditions, El Badrawi ultimately agreed to voluntarily depart the United States immediately. Even then, however, El Badrawi claims that, in order to continue investigating him, federal officials did not remove him and delayed his release. El Badrawi was finally allowed to leave the United States on December 22, 2004, more than forty days after he had agreed to voluntary departure.

In this civil action, El Badrawi chiefly seeks monetary damages to compensate him. He also seeks to force several federal agencies to expunge various records that they maintain against him. El Badrawi asserts a number of theories of relief, many of which raise rather complex questions related to federal jurisdiction, principles of immunity, and immigration law.

The state defendant has filed a Motion to Dismiss. *See* Doc. No. 19. The federal defendants have all filed Motions to Dismiss or for Summary Judgment. *See* Doc. Nos. 22, 25, 35, 36. For the reasons that follow, the state defendant's Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART.** The individual federal defendants' Motion to Dismiss is **GRANTED,** and their Motion for Summary Judgment is **DENIED AS MOOT.** The other

federal defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART,** and their Motion for Summary Judgment is **DENIED IN PART AND DENIED AS MOOT IN PART.**

## I. BACKGROUND

Because all defendants have filed Motions to Dismiss, the court describes the facts as set out in El Badrawi's Complaint, drawing all factual inferences in his favor.[1] *See Yung v. Lee,* 432 F.3d 142, 146 (2d Cir.2005).

El Badrawi is a foreign national. In 1993, he first entered the United States on a nonimmigrant student visa, which allowed him to pursue and obtain a master's degree in pharmacology at Northeastern University. Then, in 1999, El Badrawi petitioned the government for an H1–B visa so that he could pursue employment in the biotechnology industry in the United States. That petition was granted. As time went on, El Badrawi periodically renewed his H1–B visa as necessary, departing and reentering the country as called for by the relevant regulations.

On April 4, 2003, the Department of Homeland Security ("DHS") granted yet another of El Badrawi's petitions for an H1–B visa. This time, El Badrawi's sponsor was the University of Connecticut Health Center ("UCONN"). On May 26, 2003, the federal government gave El Badrawi an H1–B visa authorizing him to enter the United States to be employed at UCONN. El Badrawi presented himself at the border, where he was granted authorization to lawfully enter the country. He then began working at UCONN as a research associate. Among other things, El Badrawi worked on a project that was

---

1. As noted above, the federal defendants have also filed Motions for Summary Judgment.

The court will deal with those Motions separately, at the end of this opinion.

developing computational software to model cell biology.

Several months after El Badrawi started work at UCONN, the Department of State ("DOS") decided to revoke El Badrawi's visa. When it did so, DOS did not provide notice to either El Badrawi, or to his employer. Additionally, the Certificate of Revocation stated that the revocation would only become effective upon El Badrawi's departure from the United States. From the date of the Certificate's issuance, through the date of El Badrawi's arrest, El Badrawi remained physically present in the United States.

When El Badrawi first entered the country using his UCONN-sponsored, H1–B visa, the government only authorized him to remain in the United States through May 1, 2004.[2] Accordingly, on March 31, 2004, UCONN filed a timely application for Extension of Stay. UCONN also paid the required fees to ensure premium processing of the application.

Notwithstanding the fact that UCONN had paid for premium processing, which should have resulted in a decision within 15 days, see 8 C.F.R. § 103.2(f)(1) (2004), DHS did not act on the extension application at all. The May 1, 2004 date came and went without DHS action either granting or denying El Badrawi's application. El Badrawi made multiple inquiries with DHS about the status of his application. All of these inquiries failed to prompt the agency into action.

Under El Badrawi's interpretation of the immigration regulations, he was not immediately required to leave the country because of DHS's shortcomings. Instead, El Badrawi believed that UCONN's timely extension application provided him the legal authority to remain in the country for 240 days, or until he received a decision on the application, whichever came first. See 8 C.F.R. § 274a.12(b)(20) (2004). Accordingly, El Badrawi continued working for UCONN, and he continued to reside at his apartment in Hartford, Connecticut.

Defendant Michael Loser is a Senior Special Agent who works for ICE. As part of operation FRONTLINE, an ICE program initiated in the runup to the 2004 election and designed to arrest and detain certain immigration violators deemed to be national security threats, Loser began investigating El Badrawi. During the course of that investigation, Loser learned that El Badrawi's extension application had been timely filed and was then pending. Nonetheless, on October 28, 2004, Loser signed an ICE form I–213, which alleged that El Badrawi was unlawfully present in the United States because he had overstayed his H1–B authorization.

A second ICE official, Resident Agent in Charge Gregory Manack, was also involved with the investigation. Manack also knew (or reasonably should have known) about El Badrawi's pending extension application. Despite this, on October 28, 2004, Manack signed a warrant for El Badrawi's arrest, and he also signed a Notice to Appear ("NTA") in which he alleged that El Badrawi was eligible to be removed from the country because he had overstayed his H1–B authorization. Additionally, on this same day, Manack signed an I–286 form, stating that after El Badrawi was arrested, he was to be detained without bond in ICE custody.

**2.** Although this fact does not appear in El Badrawi's Complaint, all parties agree that it is true. See Individual Federal Defendants' 56(a)(1) Stat. at ¶ 4; El Badrawi's Individual Federal Defendants 56(a)(2) Stat. at ¶ 4. Because this fact has an important bearing on the federal defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, the court discusses this fact in connection with the Motion to Dismiss.

The next day, without any warning from ICE, Loser and two other ICE agents arrested El Badrawi at 8 p.m. in the parking lot of his residence. The agents then transported the handcuffed El Badrawi to an ICE facility in Hartford, where he was interrogated by Loser and served with the NTA.

Later that night, ICE transported El Badrawi to the Hartford Correctional Center ("HCC"), a prison facility operated by the State of Connecticut. El Badrawi was strip-searched upon entering the facility and then placed in the general population of convicted criminals and criminal pretrial detainees. This was the first time he had ever been incarcerated, and he alleges that the conditions he experienced were "traumatic, punitive, and excessively harsh." Compl. at ¶ 64.

Some of El Badrawi's difficulty stemmed from the fact that he has Crohn's disease, a condition that causes inflammation of the gastrointestinal tract and which can result in severe pain if left untreated. At the time of his arrest, El Badrawi took daily medication for his condition. Although ICE agents took his medication from his residence, the medicine was not transported to HCC. Despite his repeated requests to prison officials, El Badrawi was not given access to medication for seven days.

While incarcerated, El Badrawi also found it difficult to observe his religion in the manner he saw fit. El Badrawi is a practicing Muslim, and his arrest happened to fall in the middle of the Holy Month of Ramadan. During Ramadan, observant Muslims are required to fast between sunrise and sunset. Accordingly, shortly after El Badrawi arrived at HCC, he asked prison officials if he could take his meals on a schedule that allowed him to fast at the prescribed times. The officials repeatedly refused, telling him that because he had arrived in the middle of Ramadan, he could not be added to the list of detainees permitted to eat on the separate meal schedule. El Badrawi was unable to observe Ramadan for the first week of his incarceration. During the second week of his incarceration, El Badrawi was only able to fast because fellow inmates took pity on him and snuck him small amounts of food, to be consumed during non-meal periods.

While all these in-prison difficulties were going on, El Badrawi was simultaneously working to try to secure his release. On November 3, 2004, he appeared before an immigration judge ("IJ") in Hartford. The IJ asked El Badrawi a number of questions suggesting that the government had national-security-related concerns about El Badrawi's presence in the country. Counsel for ICE then claimed that El Badrawi was not legally in the country, in light of both the October 2003 revocation of his visa, and the May 1, 2004 expiration of his H1–B authorization. Although El–Badrawi contested ICE's legal argument and explained his belief that he was entitled to a 240 day extension, ICE did not relent from its prosecution. It also continued to detain El Badrawi without bond.

El Badrawi again appeared before an IJ on November 10, 2004. At this proceeding, El Badrawi agreed to accept a "deal" in which he was granted voluntary departure from the country. Accordingly, the IJ ordered El Badrawi to depart the country under DHS safeguards. El Badrawi maintains that he agreed to this deal only because he had been subjected to traumatic confinement conditions, because he had been falsely linked to national security concerns, and because he had not yet been fully informed about his lawful immigration status. Compl. at ¶ 107.

At the November 10 hearing, the DHS prosecutor told El Badrawi that he would be able to leave the country within six

days.[3] This promise was not fulfilled. Instead, El Badrawi remained at HCC for 42 days after agreeing to voluntary departure. During that entire time, El Badrawi's passport and other documents were in order, and (through his attorney) he repeatedly asked ICE to expedite his removal. He even went so far as to offer to pay for a plane ticket on the earliest available flight to either of the two countries where he holds citizenship. Despite these requests, ICE officials (including Manack and Loser) refused to release El Badrawi. In refusing to do so, they offered no justification for the delay. El Badrawi alleges that the United States detained him without any immigration law purpose and without any evidence that he posed a danger to anyone or was a flight risk.

On December 22, 2004, El Badrawi was finally placed on a flight out of the country. Although El Badrawi is no longer in the United States, he continues to have ongoing concerns about the electronic records that various federal agencies are maintaining about him. In particular, he alleges that the Treasury Enforcement Control System ("TECS"), a database maintained by DHS, and the National Crime Information Center ("NCIC"), a database maintained by the FBI, contain inaccurate information about his arrest and detention, as well as inaccurate results from ICE's investigation.

On July 13, 2007, El Badrawi filed the instant action. The named defendants are as follows: Charles Lee, the Warden at HCC, who is sued in his personal and official capacities; Manack and Loser, who are both sued in their personal capacities

only; Robert Mueller, Director of the FBI, sued in his official capacity; Michael Chertoff, the Secretary of DHS, sued in his official capacity; the FBI; DHS; and the United States.

In his Complaint, El Badrawi asserts a number of claims. These claims are: (1) a Section 1983 claim against Warden Lee, claiming that El Badrawi was denied his constitutional right to free exercise of religion; (2) a Section 1983 claim against Lee, asserting that he abridged El Badrawi's due process rights by denying him his medication;[4] (3) a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc, *et seq.*, asserted against Warden Lee in his official capacity; (4) a *Bivens* claim against Manack and Loser, asserting that El Badrawi was arrested and detained in violation of his Fourth and Fifth Amendment rights; (5) a *Bivens* claim against Manack and Loser, contending that the defendants violated El Badrawi's Fourth and Fifth Amendment rights by delaying his voluntary departure; (6) a claim against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671, asserting causes of action for false arrest/false imprisonment, malicious prosecution, vexatious suit, intentional infliction of emotional distress, and abuse of process; (7) a common law claim against the FBI and DHS seeking the expungement of information in the NCIC and TECS databases; and (8) a claim against the FBI under the NCIC statute, 28 U.S.C. § 534, seeking expungement of information in the NCIC database.

---

**3.** The IJ's voluntary departure order, however, gave the government up to 30 days to effect removal.

**4.** El Badrawi brought a similar, *Bivens* claim against Loser, but he has since abandoned

this claim. *See* Plaintiff's Mem. in Opposition to Motion to Dismiss or For Summary Judgment of Defendants Manack and Loser ("Plaintiff's Opp. to Manack and Loser Motions") at 8 n. 4.

## II. CLAIMS AGAINST THE STATE DEFENDANT

In his Motion to Dismiss, Warden Lee advances several arguments to dismiss each of the claims against him. The court will take these up in turn, recognizing that it must accept all factual allegations in the Complaint as true. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007). Dismissal is only warranted if the facts as alleged are insufficient to "raise a right to relief above the speculative level." *Id.* The plaintiff is required to provide sufficient factual amplification such that his claims are plausible. *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008).

### A. Free Exercise Claim

■ In his free exercise claim, El Badrawi asserts that Warden Lee deprived him of his First Amendment rights by preventing him from obtaining meals on a schedule consistent with his observance of Ramadan.[5] As El Badrawi correctly notes, prison officials run afoul of the First Amendment's Free Exercise Clause when they impose substantial burdens on a plaintiff's sincerely-held religious beliefs, for reasons not reasonably related to legitimate penological interests. *See Ford v. McGinnis*, 352 F.3d 582, 588–95 (2d Cir. 2003). The Second Circuit has regularly held that failure to accommodate a prisoner's dietary restrictions will constitute a free exercise violation. *See id.* at 597 (holding that it is clearly established law that "a prisoner has a right to a diet consistent with his or her religious scruples," so long as the defendant has not advanced a legitimate penological justification for withholding this diet); *McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir. 2004); *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir.1992) (per curiam).[6]

In response, Lee contends that insufficient facts have been pled to establish that he is responsible for El Badrawi's inability to obtain meals on a Ramadan-consistent schedule. Citing matters outside the pleadings,[7] Lee points out that prison policy required new inmates to be put on the prison's Ramadan list "as soon as possible" following the facility orientation process. Lee argues that he cannot be held liable, under Section 1983, for any mistakes made by subordinate corrections officers in implementing this policy.

Generally, "[a] supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir.2002) (citing *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir.1999)). However, a supervisor may be found to be liable for a subordinate's actions when he

---

5. In his opposition to the Motion to Dismiss, El Badrawi has clarified that this claim only seeks a monetary award against Warden Lee in his personal capacity. *See* Plaintiff's Mem. in Opposition to the State Defendant's Motion to Dismiss at 15 n. 4 ("Plaintiff's Opp. to Lee Motion"). Plaintiff expressly disclaims that he is seeking injunctive relief or damages from Lee in his official capacity. *Id.*

6. Although Lee fleetingly invokes the doctrine of qualified immunity, *see* Mem. in Support of State Defendant's Motion to Dismiss at 9 n. 4, the above-cited cases make clear that the relevant law is clearly established. Indeed, Lee

has not argued that legitimate prison interests were served by preventing El Badrawi from being on the Ramadan list. Lee only argues that prison policy in fact permitted El Badrawi to join the Ramadan list, which policy was apparently applied incorrectly by the corrections officers.

7. Lee acknowledges that the prison rules are outside of the pleadings, but he contends that the court can take judicial notice of these rules. Because it does not affect the outcome of the Motion to Dismiss, the court will assume that Lee is correct.

(1) directly participated in the action; (2) failed to remedy the wrong after learning of the violation through a report or appeal; (3) "created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue;" or (4) "was grossly negligent in managing subordinates who caused the unlawful condition or event." *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986).

In his Complaint, El Badrawi alleges that Warden Lee "failed to train and supervise prison officials to follow policies requiring prisoners [be given] the right to freely exercise their religion, and tolerat[ed] their violations of these policies." Compl. ¶ 94. If true, this allegation would plainly suffice to establish Lee's liability under Section 1983. Accordingly, the only question is whether El Badrawi has pled sufficient facts to make this allegation "plausible." *See Boykin*, 521 F.3d at 213.

 In the court's view, the plaintiff has pled sufficient facts to make the allegation plausible. El Badrawi alleges that multiple prison officials repeatedly told him that he could not be added to the Ramadan list mid-month. Compl. ¶¶ 80–81. While these officials may have been incorrect in their application of prison policies, the fact that multiple officials disobeyed, or misunderstood, prison regulations certainly makes it plausible that Warden Lee failed to appropriately train and/or supervise his staff to ensure that they accommodated

Ramadan observances.[8] Moreover, while defendant points out that El Badrawi does not name these prison officials, or indicate their ranks and positions, there is no reason why he is required to do so at the pleading stage. His task is to make his allegations about Warden Lee rise above the "speculative level," *ATSI Commc'ns*, 493 F.3d at 98. He has done so.

### B. Medical Treatment Claim

In his other personal capacity claim against Warden Lee, El Badrawi asserts that he was denied medication for his Crohn's disease, in violation of his Fourteenth Amendment due process rights.[9] In response, Lee suggests that the conduct alleged, while perhaps showing improper medical care, does not rise to the level of a constitutional violation. Lee also suggests that insufficient facts have been pled to show that he is personally liable under Section 1983.

 When the State incarcerates an individual pending further proceedings, the Due Process Clause requires that the State provide a certain level of medical care. *See Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244–45, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). In the pretrial context, the State's obligations are at least as great as its Eighth Amendment obligations to care for convicted prisoners. *Id.; see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir.1996). A claim can survive if

---

8. Relatedly, Warden Lee briefly argues that he is entitled to qualified immunity because a reasonable supervisor would not have known about the erroneous statements made by the anonymous prison officials. Mem. in Support of State Defendant's Motion to Dismiss at 9 n. 4. This misses the point. Whether or not Lee actually knew about the specific statements, plaintiff has plausibly alleged that Lee failed to properly train or supervise his subordinates. This is sufficient to survive a Motion to Dismiss.

9. The court understands this claim to be one for damages only against Lee in his personal capacity. A Section 1983 claim for damages against Lee in his official capacity would be barred by sovereign immunity, *see Kentucky v. Graham*, 473 U.S. 159, 165–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), and would also be barred because official capacity state defendants are not "persons" within the meaning of Section 1983, *see Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

the plaintiff shows that prison officials were deliberately indifferent to his serious medical condition. *Liscio v. Warren,* 901 F.2d 274, 276 (2d Cir.1990). Moreover, in the pretrial context, the Second Circuit has applied an objective test for deliberate indifference that simply asks whether a defendant was on notice of a serious condition, and then failed to act in response. *See id.* at 276–77.

■ There can be no real dispute that Crohn's disease, which causes severe pain when left untreated, constitutes a serious medical condition. *Cf., e.g., Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003) (plaintiff's substantial facial pain constituted a serious medical condition). Additionally, it is plain that plaintiff has alleged sufficient facts to show that various jail officials were deliberately indifferent. Indeed, he alleges that he made *repeated* requests to prison officials for his prescribed medication for Crohn's disease, and that these requests were denied. *See Weyant,* 101 F.3d at 857 (finding that an official was deliberately indifferent after he was informed of the plaintiff's condition, and then failed to act accordingly).

Lee argues that insufficient facts have been pled to plausibly demonstrate that he is personally liable for El Badrawi's lack of proper health care. Lee notes that, as the prison warden, it is implausible that he would personally have been on notice of El Badrawi's condition.[10]

As discussed above, however, a state official can be liable under Section 1983 for gross negligence in supervision, and for the creation or failure to rectify an unconstitutional policy or custom. In his Complaint, El Badrawi alleges that Warden Lee "fail[ed] to train and supervise prison officials to follow policies requiring prisoners' access to medication, and by tolerating their violations of these policies, which denied ... El Badrawi access to medication for his Crohn's disease for seven days." Compl. ¶ 76. This allegation, if true, would be sufficient to impose supervisory liability. The allegation rises above the speculative level in light of El Badrawi's other allegation that multiple prison officials denied his repeated requests for his medication. Because multiple officials engaged in this behavior repeatedly, it is at least plausible that HCC has a widespread problem in how it administers medical care, attributable to problems in supervision, such that either a custom or policy or failure to train allowed this constitutional violation to occur, or the supervision problems were the result of gross negligence.

## C. *RLUIPA Claim*

As his final claim against Warden Lee, El Badrawi contends that Lee is liable under RLUIPA for his failure to accommodate El Badrawi's observance of Ramadan. This is a claim for money damages only, and plaintiff has brought this claim against Lee in his official capacity only. As a result, El Badrawi's lawsuit is equivalent

---

**10.** Even though this is a Motion to Dismiss, Lee asks the court to take judicial notice of factual findings from another case. This request is improper. Although a court may take judicial notice of public records such as judicial decisions, it may only take notice of the *existence* of statements contained in the records, as distinguished from the *truth* of those statements. *See Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007).

Lee also asks the court to rely upon medical records that show El Badrawi received adequate treatment. This is also improper on a Motion to Dismiss, which must be adjudicated by accepting all allegations in the Complaint as true. *See Goldstein v. Pataki,* 516 F.3d 50, 57 (2d Cir.2008); *see also Roth,* 489 F.3d at 509 (discussing the narrow circumstances, inapplicable here, in which a court may refer to matters outside the pleadings in deciding a Motion to Dismiss).

to suing the State of Connecticut directly. Unless El Badrawi can show that the State has waived its immunity from suit, the claim will be barred by the Eleventh Amendment. *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); *Kentucky v. Graham,* 473 U.S. 159, 165–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

El Badrawi argues that sovereign immunity does not apply because RLUIPA expressly abrogates the State's immunity from suit. He points to language in RLUIPA authorizing plaintiffs to "obtain appropriate relief against a government" if they prove RLUIPA violations, 42 U.S.C. § 2000cc–2(a), and he contends that this language is sufficiently clear to overcome the State's immunity claims. The State asserts that RLUIPA authorizes suits for injunctive and declaratory relief, but does not authorize suits for damages.

The issue presented by the parties is a difficult one that has split the circuits. The Eleventh Circuit has held that RLUIPA does authorize suits for money damages against the State. *See Smith v. Allen,* 502 F.3d 1255, 1271 (11th Cir.2007). The Fourth Circuit has reached the opposite conclusion, *see Madison v. Virginia,* 474 F.3d 118, 131–33 (4th Cir.2006), and the D.C. Circuit has held that similar language in the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb–2(1), does not constitute a valid waiver of sovereign immunity, *see Webman v. Federal Bureau of Prisons,* 441 F.3d 1022, 1025–26 (D.C.Cir.2006). District courts are split as well. *See Sisney v. Reisch,* 533 F.Supp.2d 952, 966–71 (D.S.D.2008) (collecting cases). The Second Circuit has yet to address the issue. Lee urges this court to follow the reasoning of the Fourth and D.C. Circuits, while El Badrawi presses the Eleventh Circuit's view.

The Supreme Court has held that Congress may only abrogate the states' sovereign immunity "by making its intention unmistakably clear in the language of the statute." *Atascadero,* 473 U.S. at 242, 105 S.Ct. 3142; *see also Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (requiring an "unequivocal expression" of congressional abrogation). This high bar reflects the importance of the Eleventh Amendment in policing the proper boundaries between federal and state authority. *See Atascadero,* 473 U.S. at 242, 105 S.Ct. 3142. Additionally, because RLUIPA was enacted under the Spending Clause,[11] courts must be vigilant to ensure that Congress has unambiguously spelled out the conditions that attach to the receipt of federal funds. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,* 548 U.S. 291, 295–96, 126 S.Ct. 2455, 165 L.Ed.2d 526 (2006).

In concluding that the phrase "appropriate relief" encompassed an award of money damages, the Eleventh Circuit reasoned that, "where Congress ha[s] not given any guidance or clear indication of its purpose with respect to remedies, federal courts should presume the availability of all appropriate remedies." *Smith,* 502 F.3d at 1270 (citing *Franklin v. Gwinnett County Public Sch.,* 503 U.S. 60, 68–69, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)). This reasoning is unpersuasive because the court failed to account for the special, clear statement rules that apply when the federal government seeks to abrogate state sov-

---

**11.** RLUIPA primarily applies only to those states that accept federal funding for their prisons. *See* 42 U.S.C. § 2000cc–1(b)(1). The Complaint alleges that El Badrawi was detained through a program at HCC that receives federal financial assistance. *See* Compl. ¶ 88.

ereign immunity. Indeed, the case relied upon by the Eleventh Circuit, *Franklin v. Gwinnett County Public Schools,* involved a *municipal* defendant rather than a state defendant. *See Franklin,* 503 U.S. at 63, 112 S.Ct. 1028. Thus, unlike the case at hand, *Franklin* did not present any concerns about state sovereign immunity. *See Northern Ins. Co. v. Chatham County,* 547 U.S. 189, 193–94, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006) (holding that a municipality's status as a county was insufficient to qualify it for state sovereign immunity); *Jinks v. Richland County,* 538 U.S. 456, 466–67, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003) (declining to require an "unmistakably clear" statement by Congress before holding a municipality liable for damages under a federal statute). Indeed, even at the time *Franklin* was decided, it was clear that municipalities generally could not assert sovereign immunity in the same manner as states. *See Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 400–401, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); *Lincoln County v. Luning,* 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890).

The Fourth Circuit's analysis did not discuss *Gwinnett.* Instead it relied heavily on *United States v. Nordic Village, Inc.,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), a case concerning Section 106(c) of the Bankruptcy Code. At the time *Nordic Village* was decided, that section provided that "notwithstanding any assertion of sovereign immunity . . . (1) a provision of [the bankruptcy code that contains the terms 'creditor,' 'entity,' or 'governmental unit'] applies to governmental units; and (2) a determination by the [bankruptcy] court of an issue arising under such a provision binds governmental units." *Nordic Village,* 503 U.S. at 32, 112 S.Ct. 1011 (citing 11 U.S.C. § 106 (1988)). The Supreme Court held that this was insufficient to constitute a waiver of the federal government's sovereign immunity in claims for monetary relief.[12] In the Court's view, the relevant language could be interpreted such that it only waived immunity as to suits for declaratory and injunctive relief: the first numbered line could be read to identify the *kind* of disputes that could be adjudicated against the government, while the second line indicated the *manner* in which that adjudication was to be applied. *Id.* at 35, 112 S.Ct. 1011. That manner was simply to make a "determination" of the disputed issue, *i.e.* to issue injunctive or declaratory relief. *Id.* The Court also identified another possible interpretation of Section 106(c) that precluded monetary relief in the instant suit. *See id.* at 36–37, 112 S.Ct. 1011. Ultimately, the court concluded that the existence of these plausible alternatives meant that "a reading imposing monetary liability on the Government is not 'unambiguous' and therefore should not be adopted." *Id.* at 37, 112 S.Ct. 1011.

Following *Nordic Village,* the Fourth Circuit concluded that the phrase "appropriate relief" in RLUIPA was susceptible to more than one interpretation. *Madi-*

---

**12.** Although *Nordic Village* involved an assertion of immunity by the federal government, rather than by a state, the same, clear statement rule applies in both contexts. *See Nordic Village,* 503 U.S. at 33–34, 112 S.Ct. 1011 (explaining that a statute must "unequivocally" waive the federal government's sovereign immunity to be effective). Indeed, the Court in *Nordic Village* adopted the reasoning of the plurality opinion in *Hoffman v. Connecticut Department of Income Maintenance,* 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), which had concluded that the same provision of the Bankruptcy Code was an insufficiently clear statement to waive a state's immunity from suit. *See Nordic Village,* 503 U.S. at 33, 112 S.Ct. 1011 (citing *Hoffman,* 492 U.S. at 102, 109 S.Ct. 2818 (plurality opinion)).

*son*, 474 F.3d at 131–32. Thus, because it could plausibly be interpreted to both include and exclude monetary relief, under *Nordic Village* the language was not an unambiguously clear waiver of sovereign immunity.

■ This court agrees with the Fourth Circuit that *Nordic Village* provides the appropriate framework for the case. Yet the Fourth Circuit's analysis is also not wholly satisfying because the *Madison* court neglected to discuss another provision of RLUIPA, 42 U.S.C. § 2000cc–2(f), which could bear on the issue. That subsection allows the United States to "bring an action for injunctive or declaratory relief to enforce compliance with this Act." This prompts an important question: if the phrase "appropriate relief" in subsection (a) refers only to injunctive or declaratory relief, why does subsection (f) expressly specify that the federal government may sue for "injunctive and declaratory relief?" Why does it not instead say that the federal government can sue for "appropriate relief" if that same phrase in subsection (a) means "injunctive and declaratory relief?" This difference in terms suggests that the phrase "appropriate relief" encompasses more than mere injunctive or declaratory relief.[13]

If the court were interpreting RLUIPA outside of the sovereign immunity context, it would easily conclude that the phrase "appropriate relief" encompassed an award of damages. Even if that interpretation of RLUIPA is the "best" one, however, the court must acknowledge that other interpretations of the phrase remain plausible. *See Webman*, 441 F.3d at 1027 (Tatel, J., concurring) (noting that because religious deprivations are usually ongoing, an award of injunctive or declaratory relief will usually be "appropriate" to remedy the violation); *cf. Shea v. County of Rockland*, 810 F.2d 27, 29 (2d Cir.1987) (holding that the phrase "other appropriate relief" in 28 U.S.C. § 1875, when read in context, did not encompass an award of damages). That is sufficient for the court to conclude that RLUIPA lacks an "unmistakably clear" waiver of sovereign immunity.[14]

Furthermore, RLUIPA's history confirms that there is more than one plausible interpretation of the statute. After the Supreme Court decided *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), Congress responded by enacting RFRA in the hopes of restoring the pre-*Smith* level of religious protection. *See City of Boerne v. Flores*, 521 U.S. 507, 512–15, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Then, when the Supreme Court concluded that RFRA

---

13. Unlike RLUIPA, RFRA does not contain a provision authorizing the United States to sue for "injunctive and declaratory relief." *See* 42 U.S.C. § 2000bb–1. Accordingly, the D.C. Circuit's opinion in *Webman* had no occasion to grapple with that issue.

14. This conclusion is further supported by another provision of RLUIPA. Section 2000cc–2(e) of Title 42, United States Code, makes clear that nothing in RLUIPA "shall be construed to amend or repeal" the Prison Litigation Reform Act (PLRA). The PLRA in turn prohibits prisoners from maintaining a civil action for damages "for mental or emotional injury suffered while in custody without a prior showing of physical injury." *Id.*

§ 1997e(e). Because religious deprivations will usually cause only mental and emotional injury, without attendant physical injury, the PLRA would presumably prohibit prisoners from recovering monetary damages for religious deprivations. *Cf. Thompson v. Carter*, 284 F.3d 411, 417–18 (2d Cir.2002) (holding that the PLRA bars prisoners from recovering purely mental and emotional damages even when litigating constitutional claims). The fact that RLUIPA did not intend to upset this provision of the PLRA provides some further support for the idea that RLUIPA was not meant to extend to claims for money damages.

was unconstitutional as applied to states, *see id.* at 536, 117 S.Ct. 2157, Congress reenacted a narrower version of the statute as RLUIPA. *See Cutter v. Wilkinson,* 544 U.S. 709, 715, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). Importantly, in the pre-*Employment Division v. Smith* regime, sovereign immunity would have barred monetary recovery for religious deprivations by states. *See Webman,* 441 F.3d at 1028 (Tatel, J., concurring). Accordingly, because RLUIPA was designed to restore the pre-*Employment Division v. Smith* regime, it is reasonable to read RLUIPA's remedial provisions as intended to parrot the individual remedies available before *Smith* was decided. *See id.*

In his Memorandum, El Badrawi has requested leave to replead his RLUIPA claim in the event the court concludes that RLUIPA does not abrogate state sovereign immunity. El Badrawi asks that he be permitted to sue Warden Lee in his individual capacity, rather than in his official capacity. *See* Plaintiff's Opp. to Lee Motion at 20 n. 7. The court **GRANTS** that request. El Badrawi has 21 days after entry of this Ruling to file an Amended Complaint.

## III. CLAIMS AGAINST MANACK AND LOSER

Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), El Badrawi brings several related claims for damages against defendants Manack and Loser. First, El Badrawi contends that when Manack and Loser initially arrested and detained him without probable cause, they violated his Fourth Amendment right to be free from unreasonable seizure and his Fifth Amendment Right to due process. Second, El Badrawi contends that his prolonged detention after he agreed to voluntary departure, unjusti-

fied by any proper immigration purpose, violated his Fourth and Fifth Amendment rights. Manack and Loser argue that a *Bivens* remedy is not available in this context. The court agrees.

As the Supreme Court has recently explained, a litigant is not automatically entitled to bring a *Bivens* claim against a federal officer "no matter what other means there may be to vindicate a protected interest." *Wilkie v. Robbins,* —— U.S. ——, ——, 127 S.Ct. 2588, 2597, 168 L.Ed.2d 389 (2007); *see also Benzman v. Whitman,* 523 F.3d 119, 125 (2d Cir.2008) ("A *Bivens* action is a blunt and powerful instrument for correcting constitutional violations and not an 'automatic entitlement' associated with every governmental infraction."). Instead, "any freestanding damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee." *Wilkie,* 127 S.Ct. at 2597. Accordingly, under current Supreme Court jurisprudence, to determine whether a *Bivens* remedy is available in any given context, the court must engage in a two-step inquiry. First, the court must ask if there are alternative processes in existence that can protect the plaintiff's constitutional rights, and which provide a "convincing reason" for the judicial branch to stay its hand. *Id.* at 2598. Second, even if no alternative remedies are available, a federal court must determine if there are "special factors" which should nevertheless preclude the recognition of a cause of action. *Bush v. Lucas,* 462 U.S. 367, 380, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983).

■ Manack and Loser contend that El Badrawi's claim is barred by the first step because the INA provides for adequate alternative remedies, and barred by the second step because the immigration and national security context of this case pres-

ents a "special factor" counseling hesitation. The court doubts that the INA's remedial scheme provides adequate remedies to foreclose a *Bivens* claim in this context. The court need not resolve the issue, however, because it agrees with Manack and Loser that special factors are present in this case.[15]

First, this case would require the court to intrude on the executive's authority to make determinations relating to national security. Notably, El Badrawi specifically alleges that he was targeted for arrest and detention pursuant to a secretive ICE program that "targeted potential immigration violators claimed to be threats to national security." Compl. ¶ 41. The judiciary is always hesitant to intrude into such core executive functions. *See Lincoln v. Vigil,* 508 U.S. 182, 192, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993); *Department of Navy v. Egan,* 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988); *cf. Chappell v. Wallace,* 462 U.S. 296, 304, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (holding that the unique structure of military discipline, and Congress's activity in the field of regulating military affairs, were special factors that precluded creation of a *Bivens* remedy); *Benzman,* 523 F.3d at 126 (holding that federal disaster response and cleanup efforts implicate the special factors needed to preclude a *Bivens* cause of action). And here, imposing liability on Manack and

Loser would be to second-guess their judgment on how best to respond to a perceived national security threat.

Second, this case has implications for the government's relationship with foreign powers. This is particularly true insofar as El Badrawi challenges his detention following the IJ's grant of voluntary departure: the executive's decision regarding when and how to send a foreign national to a foreign country plainly implicates our country's relationship with both the alien's home country and any potential foreign destination. Essentially all aspects of the relationship between the federal government and its alien visitors are ones that will implicate foreign relations concerns. *Mathews v. Diaz,* 426 U.S. 67, 82, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *see also Harisiades v. Shaughnessy,* 342 U.S. 580, 588–89, 72 S.Ct. 512, 96 L.Ed. 586 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous ... policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."); *cf. Demore v. Kim,* 538 U.S. 510, 513, 521–22, 123 S.Ct. 1708, 155 L.Ed.2d 724 (holding that foreign relations concerns were implicated by an INA provision that mandated detention for certain aliens during removal proceedings). Because of this relationship,

---

**15.** In *Arar v. Ashcroft,* 532 F.3d 157 (2d Cir. 2008), a Second Circuit panel grappled with many of the same *Bivens*-related issues that are presented in this case. By a 2–1 vote, the panel in *Arar* found that the plaintiff could not maintain a *Bivens* action based on constitutional violations that arose out of his removal to a foreign country. Approximately six weeks after the panel issued its decision in *Arar,* the full Second Circuit, acting *sua sponte,* elected to rehear the case *en banc.* Notably, the Order issued by the court did not say that the panel opinion had been vacated or withdrawn. Nor did the Order indicate

which of the many issues in *Arar* had prompted the *en banc* court's rehearing decision. Accordingly, as of the writing of this Ruling, *Arar's* precedential status within this Circuit appears somewhat ambiguous. *Cf. Baker v. Pataki,* 85 F.3d 919, 921 n. 2 (2d Cir.1996) (en banc) (per curiam) (holding that when the *en banc* court is equally divided, the original panel opinion will lack precedential effect). Because it does not affect the outcome of this case, the court will assume that the *Arar* panel opinion is to be treated as though it had been withdrawn.

immigration policy is "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades*, 342 U.S. at 589, 72 S.Ct. 512; *see also Reno v. Flores*, 507 U.S. 292, 305, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (explaining that the federal government's relationship with alien visitors is so heavily entrusted to Congressional oversight that there is no other "conceivable subject [over which] the legislative power of Congress is more complete" (quoting *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (internal quotation marks omitted))). Moreover, when the political branches exercise their "broad power over naturalization and immigration," they may permissibly engage in action "that would be unacceptable if applied to citizens." *Mathews*, 426 U.S. at 79–80, 96 S.Ct. 1883.

Finally, in evaluating the "special factors" aspect of the *Bivens* inquiry, the Second Circuit has instructed courts to account for the extent to which the *Bivens* claim arises in a subject area that has " 'received careful attention from Congress.' " *Benzman*, 523 F.3d at 126 (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 423, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988)). Immigration is one policy area which has received an inordinate amount of attention from Congress. *See Shi Liang Lin v. United States DOJ*, 494 F.3d 296, 323 (2d Cir.2007) (en banc) (Katzmann, J., concurring in the judgment) ("[I]mmigration ... ha[s] consistently been on Congress's radar. Immigration is frequently in the news, and Congress has repeatedly legislated in this area."); *Mahmoud v. Gonzales*, 485 F.3d 175, 177 (1st

Cir.2007) (discussing Congress's frequent forays into immigration legislation).

To be clear, the court is not concluding that the immigration context *alone* constitutes a sufficient reason for the court to stay its hand. Instead, it is the combination of the immigration context *and* the national security concerns motivating El Badrawi's arrest and subsequent detention that drives the court's conclusion that, under controlling precedent, "special factors" preclude a *Bivens* remedy. Because of this conclusion, the court must **GRANT** Manack and Loser's Motion to Dismiss.

## IV. FTCA CLAIMS AGAINST THE UNITED STATES

The FTCA creates liability for the federal government when federal employees, acting within the scope of their employment, commit acts that would be actionable under state tort law if committed by a private party. *See* 28 U.S.C. §§ 1346(b)(1), 2674. Under the FTCA, El Badrawi brings four categories of claims against the United States: (1) a claim for false arrest/false imprisonment;[16] (2) a claim for malicious prosecution and vexatious suit; (3) a claim for abuse of process; and (4) a claim for intentional infliction of emotional distress.

Analytically, it is helpful to sort out the specific government conduct for which each of these claims seeks compensation. As the court reads the Complaint, these FTCA claims cover somewhat overlapping conduct during El Badrawi's interactions with DHS. The false arrest/false imprisonment claim is based on El Badrawi's arrest and initial detention pending an appearance in immigration court. The malicious prosecution and vexatious suit claim is based on the fact that Manack and Loser

---

**16.** Connecticut treats the torts of false arrest and false imprisonment identically. *See Green v. Donroe*, 186 Conn. 265, 267, 440

A.2d 973 (1982); *Outlaw v. City of Meriden*, 43 Conn.App. 387, 392, 682 A.2d 1112 (1996).

served El Badrawi with an NTA, formally placing him in removal proceedings. The abuse of process claim appears to be based on multiple actions: El Badrawi's arrest and initial detention, his receipt of the NTA, and his subsequent detention after entry of the voluntary departure order. Finally, the intentional infliction of emotional distress claim appears to arise out of El Badrawi's arrest and initial detention, as well as his subsequent detention following the grant of voluntary departure.

### A. Jurisdictional Issues

The government begins by pressing its contention that all of these claims are barred by several jurisdictional provisions in the INA: 8 U.S.C. §§ 1226(e), 1252(a)(2)(B)(ii), 1252(b)(9), 1252(g). The court takes up each jurisdictional provision in turn.

#### 1. 8 U.S.C. § 1252(g)

■ The government first contends that El Badrawi's FTCA claims are barred by Section 1252(g). This section states:

> Except as provided in [section 1252] and notwithstanding any other provision of law (statutory or non-statutory), including [28 U.S.C. § 2241] or any other habeas corpus provision, and [28 U.S.C. §§ 1361 and 1651], no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

The government argues that this section precludes El Badrawi's claims because he is simply objecting to the government's decision to "commence proceedings" and "execute removal orders" against him under the INA.

To the extent that El Badrawi presses claims for malicious prosecution and vexatious suit, and abuse of process insofar as the process "abused" was the issuance of the NTA, the government is correct in its invocation of this jurisdictional bar. El Badrawi's claims for malicious prosecution and vexatious suit, by their very nature, seek to impose liability for the government's decision to initiate legal proceedings against El Badrawi. *See DeLaurentis v. City of New Haven*, 220 Conn. 225, 248, 597 A.2d 807 (1991) (discussing claims for vexatious suit and malicious prosecution). Similarly, to the extent that El Badrawi's claim for abuse of process seeks to impose liability for the fact that he was placed in immigration proceedings, this claim is jurisdictionally barred for the same reason. Indeed, these conclusions flow from the Supreme Court's decision in *Reno v. Am.-Arab Anti–Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999), which held that Section 1252(g) acted as a jurisdictional bar to a suit seeking to enjoin removal proceedings because of selective prosecution. *Id.* at 472–76, 487, 119 S.Ct. 936; *see also Ali v. Mukasey*, 524 F.3d 145, 150 (2d Cir.2008) (holding that Section 1252(g) applied to a claim that DHS had improperly exercised its discretion in bringing removal proceedings against various aliens).[17]

El Badrawi's remaining FTCA claims present a different question. The court will first deal with these claims to the extent they arise from his initial arrest and detention. As El Badrawi correctly ob-

---

**17.** El Badrawi suggests that Section 1252(g) should nonetheless be interpreted not to bar his FTCA claim because to do so would be to read one statute to repeal another, which is disfavored. Plaintiff's Mem. in Opp. to United States, et al, at 12–13. However, Section 1252(g) is clear that its bar applies "notwithstanding any other provision of law (statutory or nonstatutory)." 8 U.S.C. § 1252(g).

serves, the Supreme Court has interpreted Section 1252(g)'s language about decisions to "commence removal proceedings" as referring to challenges to DHS's exercise of "prosecutorial discretion." *AADC*, 525 U.S. at 485 n. 9, 119 S.Ct. 936. That observation is important because DHS's decisions to arrest and detain El Badrawi were decisions that were separate and discrete from the agency's decision to initiate removal proceedings against him. *See* 8 U.S.C. § 1226(a) (explaining that in most circumstances, "an alien *may* be arrested and detained pending a decision on whether the alien is to be removed from the United States" (emphasis added)); 8 C.F.R. § 236.1 (explaining that "[a]t the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent *may* be arrested and taken into custody" (emphasis added)). Indeed, as the Seventh Circuit has noted, an alien can successfully challenge the government's decision to detain him without actually disrupting ongoing removal proceedings. *See Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir.1999). Because Section 1252(g) applies only to "three discrete actions that the Attorney General may take," *AADC*, 525 U.S. at 482, 119 S.Ct. 936, and because the decision to arrest and detain an alien is "discrete" from the decision to commence removal proceedings, El Badrawi's claims arising from his arrest and initial detention are not barred.

Relying on a Fifth Circuit case, the United States points out that these claims are "connected directly and immediately with a 'decision or action by the Attorney General to commence proceedings,'" *Foster v. Townsley*, 243 F.3d 210, 214 (5th Cir.2001) (quoting *Humphries v. Various Federal USINS Employees*, 164 F.3d 936, 943 (5th Cir.1999)), and therefore barred by Section 1252(g). However, the Fifth Circuit's analysis in *Foster* is not persua-

sive. *Foster* relied heavily on the Fifth Circuit's earlier opinion in *Humphries*, a pre-*AADC* case. *See Foster*, 243 F.3d at 214. Although the Fifth Circuit recognized that *Humphries* might not be good law in light of *AADC, see id.* at 213 n. 2, the court nonetheless concluded that its *Humphries* opinion stated the correct standard. *Id.* at 214. This court respectfully disagrees.

The court further notes that *Foster* is distinguishable, as that case actually involved a challenge to the execution of a deportation order, rather than a challenge to an initial arrest and detention. Accordingly, the *Foster* court did not have occasion to consider whether arrest and detention were sufficiently discrete from the initiation of removal proceedings.

The government also relies on the Ninth Circuit's opinion in *Sissoko v. Rocha*, 509 F.3d 947 (9th Cir.2007). *Sissoko* held that Section 1252(g) acted to bar a *Bivens* claim for false arrest. *Id.* at 950. However, the alien in *Sissoko* was placed into expedited removal proceedings, pursuant to which detention was mandatory. *See id.* at 949 (citing 8 U.S.C. § 1225(b)(1)(B)(iii)(IV)). Accordingly, in *Sissoko* the alien's arrest and detention necessarily flowed from the government's decision to initiate removal proceedings. Such is not El Badrawi's case.

The court must also consider whether it has jurisdiction over El Badrawi's intentional infliction of emotional distress, and abuse of process claims, insofar as they are based on El Badrawi's prolonged detention after the entry of his voluntary departure order. The United States suggests that these claims are barred by Section 1252(g) because they arise from a decision of the Attorney General to execute a removal order.

The United States is incorrect. As discussed above, *AADC* held that Section 1252(g) applies to only three discrete actions of the Attorney General. Notably, when El Badrawi claims that federal officials kept him detained too long instead of deporting him, he is *not* challenging any decision to "execute removal order[s]." Instead, he is challenging the government's *failure* to execute a removal order. *Cf. Thapa v. Gonzales,* 460 F.3d 323, 330 (2d Cir.2006) (holding that an INA provision that barred courts from reviewing a "denial of a request" for a voluntary departure order did not prevent courts from reviewing *grants* of such requests (quoting 8 U.S.C. § 1229c(f))).

Indeed, this understanding of Section 1252(g) finds further support in the Supreme Court's opinion in *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). The habeas petitioners in *Zadvydas* had all been ordered removed from the country by immigration judges. Although a federal statute generally required the government to effectuate such removal within 90 days, the government nonetheless elected to hold the petitioners indefinitely, irrespective of whether or not such detention appeared to be reasonably necessary. The petitioners claimed that this indefinite detention was either unconstitutional, or not authorized by the INA. Despite the fact that the petitioners appeared to be complaining about the government's failure to execute the removal orders against them, the Supreme Court held that its jurisdiction to hear such claims was not barred by several INA provisions, including Section 1252(g). *Zadvydas,* 533 U.S. at 688, 121 S.Ct. 2491. The only explanation offered specific to Section 1252(g) was a parenthetical, noting that the section was "applicable to deci-

sions to 'commence removal proceedings, adjudicate cases, or execute removal orders.'" *Id.* at 688, 121 S.Ct. 2491 (quoting 8 U.S.C. § 1252(g)). By its terms, *Zadvydas* appears to hold that Section 1252(g) will not bar an alien from challenging the government's failure to deport him.

Notwithstanding *Zadvydas,* the court recognizes that the Second Circuit's opinion in *Duamutef v. INS,* 386 F.3d 172 (2d Cir.2004), would appear to stand for the contrary proposition. In *Duamutef,* the plaintiff had been convicted of murder in state court and sentenced to a term of fifteen years to life imprisonment. *Id.* at 174. While he was serving his prison sentence, INS officials placed him in deportation proceedings, and he ultimately became subject to a final order of deportation. *Id.* Subsequently, Duamutef convinced state authorities to award him a form of parole that permitted him to be paroled if the INS agreed to promptly deport him. *Id.* at 174–75. When the INS refused to so agree, Duamutef sought a writ of mandamus compelling INS to execute the deportation order. The Second Circuit held that the action was precluded by Section 1252(g) because Duamutef was challenging the Attorney General's refusal to execute a removal order. *Id.* at 180–81.[18]

Despite *Duamutef's* seemingly-on-point language, the court concludes that it is not at this time bound by *Duamutef's* interpretation of Section 1252(g). Two years after *Duamutef* was decided, the Supreme Court issued its opinion in *Clark v. Martinez,* 543 U.S. 371, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). *Clark* held that when a court is deciding "which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the

---

**18.** Although *Duamutef* was decided two years after *Zadvydas,* the court in *Duamutef* did not cite *Zadvydas* or consider its impact on the case at hand.

other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court." *Id.* at 380–81, 125 S.Ct. 716. *Duamutef* is inconsistent with *Clark* because *Duamutef* failed to apply the canon of constitutional avoidance in interpreting Section 1252(g), notwithstanding the fact that the *Duamutef* plaintiff was not actually advancing a constitutional claim.

The canon of avoidance is appropriately invoked in interpreting Section 1252(g). When there are two possible interpretations of an ambiguous statute, and one of those interpretations would raise a substantial constitutional question, the canon of constitutional avoidance requires a court to choose the statutory construction that avoids the constitutional issue. *Id.* at 678, 121 S.Ct. 2491. Under the United States's reading of Section 1252(g), a litigant would be unable to bring suit (through the habeas statutes or otherwise) [19] to prevent the deprivation of his Due Process rights when he was being held for reasons unconnected to any legitimate immigration purpose. Such a litigant could advance a substantial question that Section 1252(g) was unconstitutional insofar as it barred his claim. *See Zadvydas*, 533 U.S. at 690–96, 121 S.Ct. 2491 (holding that detention, unconnected with legitimate immigration concerns, raises substantial due process concerns); *Rhodes–Bradford v. Keisler*, 507 F.3d 77, 81–82 (2d Cir.2007) (explaining that serious due process concerns would be raised if a statute could be read to strip courts of jurisdiction to remedy *ultra vires* behavior). Because Section 1252(g) is at the very least ambiguous regarding whether it applies to the government's failure to execute a removal order, it is appropriate to conclude that the statute does not bar

claims such as El Badrawi's arising out of such inaction.

The court finally notes that the interpretations of Section 1252(g) it has advanced find further support in the statutory purposes behind that section. The Supreme Court in *AADC* surmised that Section 1252(g) served to prevent the "deconstruction, fragmentation, and hence prolongation of removal proceedings." 525 U.S. at 487, 119 S.Ct. 936. El Badrawi's suit, which seeks only money damages to be awarded after immigration proceedings have been completed, poses no such risk of prolonging removal proceedings. Moreover, to the extent that El Badrawi is complaining about the government's failure to deport him in a timely manner, he is attempting to *hasten* removal proceedings, rather than prolong them.

### 2. 8 U.S.C. §§ 1226(e), 1252(a)(2)(B)(ii)

The United States next argues that El Badrawi's FTCA claims are barred by Sections 1226(e) and 1252(a)(2)(B)(ii) of Title 8.

Insofar as the government relies on Section 1252(a)(2)(B)(ii), its argument is easily rejected with regard to the false arrest/false imprisonment claim. By its terms, this section states that "no court shall have jurisdiction to review ... any ... decision or action [by immigration officials] the authority for which is specified under [Title 8] to be in the discretion of [immigration officials], other than the granting of relief under [8 U.S.C. § 1158(a)]." 8 U.S.C. § 1252(a)(2)(B)(ii). Because ICE officials do not have discretion to violate the constitution, this provision will not bar El Badrawi's claims based on unconstitutional conduct by these officials. *See Zadvydas*, 533 U.S. at 688, 121

**19.** Several years after *Zadvydas* was decided, Congress amended Section 1252(g) to include

language clarifying that the jurisdictional bar applied even to habeas corpus proceedings.

S.Ct. 2491; *Demore*, 538 U.S. at 517, 123 S.Ct. 1708; *Myers & Myers, Inc. v. United States Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir.1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority."). Thus, if El Badrawi can succeed in showing that federal officials acted unconstitutionally when they arrested him, his false arrest/false imprisonment claims will not be barred by this Section. And because the elements of false arrest/false imprisonment under Connecticut law are essentially the same elements needed to articulate a Fourth Amendment violation, *see Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir.2007); *Davis v. Rodriguez*, 364 F.3d 424, 433–34 (2d Cir.2004), there is no jurisdictional bar if El Badrawi has a valid claim on the merits.

El Badrawi's claims for intentional infliction of emotional distress and abuse of process present a slightly more complicated issue. However, insofar as these claims arise out of El Badrawi's arrest, these claims will survive Section 1252(a)(2)(B)(ii) if he shows that his arrest was effected unconstitutionally. That is because, as just discussed, El Badrawi will be challenging an action by INS officials that they lacked the discretion to take.

Additionally, Section 1252(a)(2)(B)(ii) is no bar to these claims insofar as El Badrawi bases them on the fact that Manack and Loser detained him after he agreed to voluntary departure. El Badrawi's Complaint alleges that this detention was undertaken "without any legitimate immigration law enforcement purpose, and without evidence that he posed a danger or flight risk." Compl. ¶ 154. As such, El Badrawi has alleged that his detention was essentially arbitrary, which is sufficient to state a due process claim. *See Zadvydas*, 533 U.S. at 690, 121 S.Ct. 2491; *Kansas v.*

*Hendricks*, 521 U.S. 346, 356–57, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (explaining that arbitrary detention constitutes a substantive due process violation, although recognizing that civil detention can be constitutional when designed to further various legitimate social goals, such as protecting society from dangerous individuals). Because Manack and Loser acted unconstitutionally when they continued to detain El Badrawi, they did not have the discretion to take these actions, and Section 1252(a)(2)(B)(ii) does not block El Badrawi's detention claim.

The government attempts to respond by suggesting that El Badrawi's detention was constitutional because, during the 42 days after he had agreed to voluntary departure, his removal was "reasonably foreseeable." *Wang v. Ashcroft*, 320 F.3d 130, 146 (2d Cir.2003) (citing *Zadvydas*, 533 U.S. at 699, 121 S.Ct. 2491). However, when the Supreme Court and the Second Circuit have upheld detention under such circumstances, they have done so as applied to aliens who were detained because of community safety concerns, and concerns about risk of flight. *See Zadvydas*, 533 U.S. at 683–86, 690–92, 121 S.Ct. 2491; *Wang*, 320 F.3d at 138. The "reasonably foreseeable" formulation is keyed off of these concerns because such concerns are constitutionally adequate to justify *temporary* detention pending removal, but are not constitutionally adequate to justify *indefinite* detention pending removal. *Zadvydas*, 533 U.S. at 687–88, 121 S.Ct. 2491.

El Badrawi's case is distinguishable because he alleges that he was detained "without any immigration law enforcement purpose, and without evidence that [El Badrawi] posed a danger or flight risk." Compl. ¶ 154. As applied to El Badrawi, it makes no sense to ask if his departure was "reasonably forseeable," as his detention became arbitrary almost immediately after

he had agreed to voluntarily depart the country.[20] The government's contrary position amounts to an argument that the government may constitutionally detain someone, for no legitimate reason whatsoever, simply because the government has given indications that the detention will end in the (near) future.[21]

Finally, the government suggests that El Badrawi's detention did not violate substantive Due Process principles because his detention did not "shock[ ] the conscience," as is required under *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). This court disagrees. On the facts as alleged, El Badrawi's prolonged detention after agreeing to voluntarily depart the country, based on no legitimate reason whatsoever, certainly could be said to shock the conscience. *See id.* at 846–47, 118 S.Ct. 1708 (equating arbitrary conduct with conscience-shocking conduct); *id.* at 845, 118 S.Ct. 1708 (explaining that "the touchstone of due process is protection of the individual against arbitrary action of government" (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)) (internal quotation marks omitted)).

In addition to invoking the jurisdictional bar in Section 1252(a)(2)(B)(ii), the government advances its argument that El Ba-

drawi's claims are barred by Section 1226(e). That section provides:

> The Attorney General's discretionary judgment regarding the application of [Section 1226] shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

8 U.S.C. § 1226(e). Through its two sentences, this statute actually contains two separate jurisdictional bars. *See Parra*, 172 F.3d at 957; *see also Demore*, 538 U.S. at 516–17, 123 S.Ct. 1708 (citing with approval the Seventh Circuit's analysis in *Parra* ). The first sentence operates to bar "review" of various discretionary decisions related to arrest and detention. The second sentence prevents a court from "set[ting] aside" similar decisions.

Insofar as the United States relies on the first part of Section 1226(e), its argument lacks merit. As discussed above, since ICE officials do not have discretion to violate the Constitution, a jurisdictional bar of this kind cannot preclude claims based on unconstitutional conduct by executive officials.

The second sentence presents a more difficult question. The Supreme Court has indicated that this sentence prohibits challenges to individual level operational deci-

---

20. Of course, El Badrawi's detention probably would not have been constitutionally problematic if the government had detained him for only a period of time reasonably necessary to effectuate his voluntary departure order. But once that reasonable period passed (and such period surely was less than 42 days, at least based on the pleadings), El Badrawi's detention became arbitrary, notwithstanding that there was still a reasonable possibility he would be released in the near future.

21. It is for this reason that the government also is not aided by the presumption, an-

nounced in *Zadvydas*, that the first six months of post-removal-order detention will be constitutionally acceptable. *See Zadvydas*, 533 U.S. at 701, 121 S.Ct. 2491. *Zadvydas's* "presumption" is designed to determine when removal will be "reasonably forseeable," and thus it only has meaningful application when a plaintiff's post-removal-order detention is initially justified by safety and/or flight risk concerns. Here, El Badrawi's continued detention occurred because the government required it as a condition of voluntary departure.

sions, while still permitting challenges to the broader statutory framework. *See Demore,* 538 U.S. at 516–17, 123 S.Ct. 1708; *see also id.* at 517, 123 S.Ct. 1708 (concluding that this provision did not divest the court of jurisdiction to entertain a habeas petition claiming that Section 1226(c) was unconstitutional). At first glance, one might therefore think that El Badrawi's FTCA claims are foreclosed: instead of bringing a broad challenge to the INA's statutory framework, El Badrawi is simply bringing a challenge to the "operational decisions" that he was to be arrested and detained.

On closer inspection, however, it becomes clear that El Badrawi's FTCA claims are not implicated by the second sentence of Section 1226(e). Importantly, that sentence only states that a court may not "set aside" detention decisions. El Badrawi's FTCA claims are not seeking to "set aside" anything: his arrest and detention have been effected and completed, and his removal proceedings have finished. Instead, El Badrawi is seeking to obtain a damages award, after the fact, for actions previously taken by ICE officials.

It is of course true that, if El Badrawi succeeds in this suit, he will necessarily have demonstrated that ICE officials acted unconstitutionally in choosing to arrest and detain him. But the phrase "setting aside" a decision implies something more than simply obtaining a judgment and monetary award calling the decision into question. Instead, the phrase refers to a court actually undoing the decision through the grant of injunctive of habeas relief. *Cf. Kirschner v. Klemons,* 225 F.3d 227, 238 (2d Cir.2000) (holding that *Younger* abstention is inappropriate in damages actions because claims for damages do not interfere with parallel state court proceedings in the same way as claims for equitable relief).

Nor can it be said that the threat of potential FTCA actions will operate to circumscribe detention decisions in the same manner that would be expected if courts could reverse detention decisions through the grant of injunctions and habeas petitions. Indeed, the Supreme Court has carefully noted all the ways in which the FTCA operates as a relatively poor deterrent to executive misbehavior. *See Carlson v. Green,* 446 U.S. 14, 20–23, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).

Comparing Section 1226(e) to other INA jurisdiction-stripping provisions further confirms the court's interpretation. Section 1252(g), for example, broadly precludes "any cause or claim" arising out of certain specified executive decisions. Had Congress intended to bar damage claims arising out of detention decisions, Congress could easily have chosen to place similarly broad language into Section 1226(e). Yet it did not do so, choosing instead to only preclude courts from "set[ting] aside" detention decisions. Faced with this narrow language, the court concludes that Section 1226(e) does not apply to FTCA claims, brought after immigration proceedings have completed, in which the plaintiff seeks money damages because ICE officials acted unconstitutionally in arresting and detaining him.

### 3. *Section 1252(b)(9)*

As a final argument that the INA has stripped this court of jurisdiction over El Badrawi's FTCA claims, the government relies on Section 1252(b)(9). That section is a sweeping provision that contains the following language:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under

[Title 8] shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under [28 U.S.C. § 2241], or any other habeas corpus provisions, ... or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9). Because of its breadth, the Supreme Court has described this section as an "unmistakable zipper clause." *AADC*, 525 U.S. at 483, 119 S.Ct. 936.

Despite its sweeping language, the reach of this section is not unbounded. Instead, it is qualified by the language that introduces all clauses in Section 1252(b): "With respect to review of an order of removal under subsection (a)(1), the following requirements apply:" 8 U.S.C. § 1252(b). This qualifying language makes sense, because the purpose of Section 1252(b)(9) is to consolidate nearly all challenges to immigration proceedings into a single petition for review of a final order of removal. *INS v. St. Cyr*, 533 U.S. 289, 313 n. 37, 121 S.Ct. 2271, 150 L.Ed.2d 347. In light of this qualifying language, and in light of Section 1252(b)(9)'s purpose, the provision has been held not to apply to claims that could never be brought during removal proceedings. *See id.* at 313–14, 121 S.Ct. 2271; *Calcano Martinez*, 232 F.3d 328, 339–40 (2d Cir.2000), *aff'd* 533 U.S. 348, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001); *Aguilar v. United States Immigration and Customs Enforcement Div. of the Dept. of Homeland Sec.*, 510 F.3d 1, 11 (1 st Cir. 2007) ("We ... read the words 'arising from' in Section 1252(b)(9) to exclude claims that are independent of, or wholly collateral to, the removal process. Among others, claims that cannot effectively be handled through the available administrative process fall within that purview.").

With this understanding of Section 1252(b)(9), it becomes clear that this court has jurisdiction over El Badrawi's FTCA claims for his arrest and initial detention. Through these claims, El Badrawi is seeking to be remedied for damages inflicted on him before he ever had the chance to utilize the administrative process.

To be sure, the administrative process did enable El Badrawi to obtain some relief from his detention insofar as it permitted him to try to obtain bond before an IJ. *See* 8 C.F.R. § 1236.1(d). Accordingly, insofar as El Badrawi claims damages from his incarceration after any bond hearing, and before the entry of the voluntary departure order, El Badrawi's claims for damages are not cognizable in this court. However, any release on bond that El Badrawi could have obtained would only have given him prospective relief from the date of the bond determination. Such release would do nothing to address his claim that he suffered damages from his arrest and pre-bond hearing detention.

El Badrawi's subsequent detention claim, based on actions taken after he had agreed to voluntary departure, is also cognizable notwithstanding Section 1252(b)(9). This claim arose only after the entry of a final order of removal.[22] *See Zadvydas*, 533 U.S. at 688, 121 S.Ct. 2491 (exercising jurisdiction over a claim arising from detention after the entry of a final order of removal).[23]

---

**22.** The Second Circuit has held that a voluntary departure order is considered a "final order of removal," under the INA's jurisdictional provisions, when that departure order contains an alternate order of removal. *See*

*Thapa*, 460 F.3d at 333–34 & n. 3. El Badrawi's voluntary departure order was of this kind. *See* Manack & Loser Exh. H.

**23.** Because El Badrawi could not have obtained relief for his initial arrest and deten-

## B. *The Heck v. Humphrey Bar*

As its next argument against El Badrawi's FTCA claims, the government seeks to invoke the doctrine of *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Heck held that if a Section 1983 plaintiff wants to recover damages for his wrongful arrest or imprisonment, and success in his suit would "render a conviction or sentence invalid," the plaintiff must show that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486–87, 114 S.Ct. 2364. The Second Circuit has subsequently extended *Heck* to apply to *Bivens* actions against federal officials. *See Tavarez v. Reno,* 54 F.3d 109, 110 (2d Cir.1995) (per curiam). The court will assume that *Heck* is also properly extended to FTCA claims in the immigration context.[24]

■ As an initial matter, *Heck* plainly does not bar El Badrawi's claims based on his excessive detention after he agreed to voluntary departure. These claims are based on torts committed following the entry of a final order of removal against him, and success on these claims will do nothing to call into question the validity of the underlying removal order itself.

*Heck* also does not bar El Badrawi's actions based on his false arrest and initial detention. *Heck's* logic is rooted in the recognition that prisoners need to exhaust their habeas remedies. *See Heck,* 512 U.S. at 480–82, 114 S.Ct. 2364. Accordingly, *Heck* will not bar an action when the prisoner was never in state confinement, and hence never had any remedy in habeas corpus in which he could challenge his conviction or confinement. *See Leather v. Ten Eyck,* 180 F.3d 420, 424 (2d Cir.1999). By the same logic, *Heck* does not bar a claim when the prisoner was in custody for such a brief period of time that any available habeas remedy would have been pointless. *See Spencer v. Kemna,* 523 U.S. 1, 18–21, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (Souter, J., concurring); *Heck,* 512 U.S. at 500, 114 S.Ct. 2364 (Souter, J., concurring in the judgment).[25]

---

tion in removal proceedings, he also was not required to exhaust his claims through that process. *See* 8 U.S.C. § 1252(d)(2) (excusing non-exhaustion when "the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of" the final order of removal that the plaintiff is seeking to challenge). Additionally, Section 1252(d)(2) has no applicability to El Badrawi's post-voluntary-departure claims. This section operates only as a restriction on "review [of] a final order of removal." *Id.* § 1252(d). If El Badrawi succeeds on his post-voluntary-departure claims, he will not have called into question the validity of the underlying order of removal.

**24.** Although the Second Circuit has not yet addressed the issue, several circuits have applied *Heck* in FTCA cases. *See Erlin v. United States,* 364 F.3d 1127, 1132 (9th Cir.2004); *Ramming v. United States,* 281 F.3d 158, 162

(5th Cir.2001) (per curiam); *Parris v. United States,* 45 F.3d 383, 385 (10th Cir.1995); *see also Dare v. United States,* 264 Fed.Appx. 183, 185 (3d Cir.2008).

All of these cases involved underlying criminal proceedings, however, rather than immigration proceedings. There is good reason to doubt that *Heck* is properly extended to civil immigration proceedings. *See Heck,* 512 U.S. at 480–82, 114 S.Ct. 2364 (basing its rule, in large part, on the exhaustion requirements peculiar to criminal habeas proceedings).

**25.** Justice Ginsburg, one of the five Justices who signed onto the Court's opinion in *Heck,* later expressed her agreement with Justice Souter's view of *Heck's* scope, even though she was not one of the four Justices who signed onto his *Heck* concurrence. *See Spencer,* 523 U.S. at 21–22, 118 S.Ct. 978 (Ginsburg, J., concurring).

The Court's opinion in *Spencer v. Kemna* further supports this conclusion. In *Spencer*, an inmate was sentenced to a three-year sentence in state court. 523 U.S. at 3, 118 S.Ct. 978. After serving a year-and-a-half in prison, the inmate was paroled. *Id.* His parole was subsequently revoked, and he filed various state court challenges in an attempt to overturn the revocation. *Id.* at 5, 118 S.Ct. 978. After those challenges failed, he filed a federal habeas petition, but while that petition was pending, he completed his prison sentence. *Id.* at 6, 118 S.Ct. 978. In an 8–1 decision, the Supreme Court concluded that the habeas petition had become mooted, notwithstanding the petitioner's assertion that *Heck* required him to prevail on his habeas challenge in order recover damages in a Section 1983 action. *See id.* at 17, 118 S.Ct. 978.

The Court's opinion in *Spencer* did not squarely hold that *Heck* would be inapplicable if the prisoner later brought a Section 1983 claim. *See id.* Still, if *Heck* were going to act as such a bar, it would be difficult to see how the habeas petition was moot in *Spencer* because the petitioner would still have had something at stake in the adjudication of his habeas petition. In any event, four of the eight Justices in the *Spencer* majority expressly concluded that *Heck* would not have barred a subsequent Section 1983 claim because the petitioner did not have a sufficient opportunity to litigate his habeas petition. *See id.* at 18–22, 118 S.Ct. 978 (Souter, J., concurring). The dissenting Justice, Justice Stevens, also agreed that *Heck* would be inapplicable. *See id.* at 25 n. 8, 118 S.Ct. 978 (Stevens, J., dissenting). The Justices' views on this issue have not escaped the Second Circuit's attention. *See Jenkins v. Haubert,* 179 F.3d 19, 26–27 (2d Cir.1999).

With this understanding of *Heck's* scope, it is clear that El Badrawi's FTCA claims are not barred. El Badrawi's arrest and detention claims turn on his argument that he was legally present in the country because he had timely filed his application for extension of stay. But under this reading of the immigration regulations, El Badrawi was only legally authorized to remain in the country for up to 240 days past May 1, 2004, *i.e.* until December 27, 2004. Given that El Badrawi was arrested on October 29, 2004, he had less than two months available to him in which he could have litigated any habeas petition. This was plainly an insufficient amount of time for El Badrawi to have been able to obtain a final judgment in his favor on a habeas corpus petition before the petition became moot.[26]

### C. *The Discretionary Function Exception*

The next issue the court must address is whether El Badrawi's claims are barred by the FTCA's discretionary functions exception. That provision excludes from the FTCA claims that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty." 28 U.S.C. § 2680(a). The government argues that, when Manack and Loser arrested and initially detained El Badrawi, they were engaged in the performance of discretionary duties.

---

**26.** Indeed, given this short timeline, it would appear understandable why El Badrawi chose to accept voluntary departure, rather than press his legal claims in immigration and/or habeas proceedings. If El Badrawi had pressed these legal claims and won, he still would have had to leave the country by December 27, 2004 (or sooner if DHS had ever acted to deny his petition for extension of stay). Accordingly, he made the reasonable choice to simply agree to voluntary departure, in the hope of hastening his release from detention.

This claim is easily dispensed with. Government agents never have the discretion to violate the Constitution. *Myers & Myers*, 527 F.2d at 1261; *see also Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (explaining that the discretionary functions exception does not apply when federal law dictates a particular course of conduct). As discussed above, *see* pp. 268–69, *supra*, if El Badrawi succeeds in proving his false arrest/false imprisonment claim, he will have succeeded in showing that the defendants acted unconstitutionally. Additionally, the court has previously explained why El Badrawi's post-voluntary-departure claims arise out of unconstitutional executive action. *See* p. 33–35, *supra*. The discretionary functions exception does not bar El Badrawi's FTCA claims.

## C. *The Merits*

In its next series of arguments, the government contends that it is not liable under Connecticut tort law for false arrest/false imprisonment, abuse of process, and intentional infliction of emotional distress. The court deals with each in turn.

### 1. *False Arrest/False Imprisonment*

■ In evaluating false arrest claims, Connecticut law draws an important distinction between arrests effectuated pursuant to a warrant, and arrests made without a warrant. Warrantless arrests will be actionable when an official arrests the plaintiff without probable cause.[27] *See Beinhorn v. Saraceno*, 23 Conn.App. 487, 491, 582 A.2d 208 (1990). By contrast, when arrests are made after an officer obtains a warrant, an action generally will not lie " 'unless there is a clear absence of jurisdiction on the part of

the court or magistrate issuing the process, [or if the warrant] upon its face ... appears [not] to be valid in the judgment of an ordinarily intelligent and informed layman.' " *Outlaw v. City of Meriden*, 43 Conn.App. 387, 393, 682 A.2d 1112 (1996). However, there is a limited exception to this rule such that a warrant will not absolve the arresting officer when his warrant application, as submitted to the magistrate, knowingly or recklessly omits or misrepresents material information. *See Ham v. Greene*, 248 Conn. 508, 527–28 & n. 9, 729 A.2d 740 (1999).

The government contends that El Badrawi's arrest was not warrantless because he was arrested pursuant to a duly issued immigration warrant. The government then argues that, because the warrant was facially valid, El Badrawi cannot maintain his tort claim.

This court disagrees. The law places a high premium on arrest warrants because such warrants are issued by neutral magistrates who provide an independent check on executive discretion. *See Coolidge v. New Hampshire*, 403 U.S. 443, 449–51, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). That is why, as a matter of federal constitutional law, search warrants issued exclusively by executive officials involved in an investigation are ignored for Fourth Amendment purposes. *See id.* at 450–51, 91 S.Ct. 2022. Although there do not appear to be Connecticut false arrest cases directly on point, the case law nonetheless implicitly recognizes the distinction between warrants issued by neutral magistrates and those issued by non-neutral executive officials. *See Ham*, 248 Conn. at 527–28 & n. 29, 729 A.2d 740 (treating an arrest as warrantless after a magistrate had issued an arrest warrant based on an application

---

**27.** It is not entirely clear if Connecticut law sets forth additional elements that must be established for warrantless arrests. If there are any such additional elements, the government has not argued that they have not been met in this case.

that contained material misstatements and omissions).

In this case, El Badrawi's arrest warrant was signed by Agent Manack, an ICE Agent intimately involved in the investigation. No neutral magistrate (or even a neutral executive official) ever examined the warrant's validity. Under Connecticut tort law (and federal constitutional law), the arrest must therefore be treated as warrantless.

 Thus understood, El Badrawi's false arrest claim will stand or fall depending on whether or not the ICE officials had probable cause to believe that El Badrawi was in the country illegally. Under Connecticut law (and federal constitutional law), probable cause exists when an officer has knowledge of sufficient facts and circumstances to warrant a reasonable officer in believing that the arrestee has committed or is committing an arrestable offense. *Walczyk*, 496 F.3d at 156.

The government maintains that its agents had probable cause to arrest El Badrawi because, notwithstanding El Badrawi's application to extend his stay, El Badrawi's legal entitlement to remain in the country ended on May 1, 2004. El Badrawi disagrees, citing an immigration regulation, 8 C.F.R. § 274a.12(b)(20), as the legal authority for his continued presence. That regulation states:

> The following classes of nonimmigrant aliens are authorized to be employed in the United States by the specific employer and subject to the restrictions described in the section(s) of this chapter indicated as a condition of their admission in, or subsequent change to, such classification. . . .
>
> A nonimmigrant alien within [various classifications, including H1–B visa holders] whose status has expired but who has filed a timely application for an extension of such stay pursuant to §§ 214.2 or 214.6 of this chapter. *These aliens are authorized to continue employment with the same employer for a period not to exceed 240 days beginning on the date of the expiration of the authorized period of stay.* Such authorization shall be subject to any conditions and limitations noted on the initial authorization. However, if the district director or service center director adjudicates the application prior to the expiration of this 240 day period and denies the application for extension of stay, the employment authorization under this paragraph shall automatically terminate upon notification of the denial decision.

8 C.F.R. § 274a.12(b)(20) (emphasis added).

 Under this regulation, it is beyond dispute that UCONN was legally allowed to employ El Badrawi for up to 240 days while his extension application was pending. Nonetheless, the government takes the seemingly untenable position that, even though El Badrawi was entitled to work in the United States, he was not entitled to be physically present in the United States. The government offers several arguments to justify this bewildering stance.

First, the government relies on a BIA decision, *In re Teberen*, 15 I. & N. Dec. 689 (1976), in which the BIA held that an alien who had overstayed his entry was deportable, even though he had submitted a timely application for extension that was still pending. *Id.* at 690–91. However, *Teberen* has no application to this case because it was decided in 1976—15 years before the INS adopted the regulation that El Badrawi relies upon. *See* 56 Fed.Reg.

41767, 41780–81 (Aug. 23, 1991).[28]

Second, the government tries to rationalize its understanding of the regulation by claiming that the regulation is designed to protect employers, and not aliens. *See* Manack and Loser Mem. in Support at 28 (citing 56 Fed.Reg. at 41781 (Aug. 23, 1991)). Thus, as the government reads the regulation, El Badrawi had to stay in the country at his own risk, while UCONN could continue to employ him without fear of running afoul of the law.

This argument views the employer's interest too narrowly. To be sure, an employer certainly has an interest in avoiding liability for employing an alien who is not authorized to work in the United States. But the employer has at least as great an interest in having that worker physically present in the United States to be able work. Indeed, if the government's interpretation of the regulation were correct, El Badrawi would have been required to depart the country by May 1, 2004, which would have deprived UCONN of his services.

Finally, the government cites to another immigration regulation that appears to authorize the government to remove an alien who submits an *incomplete* application for extension of stay, notwithstanding the fact that such an alien remains authorized to be employed in the United States. *See* 8 C.F.R. § 103.2(b)(10)(ii).[29] This scenario is plainly distinguishable from the case at hand, in which El Badrawi submitted a timely and *complete* extension application.

Ultimately, the government's interpretation of 8 C.F.R. § 274a.12(b)(20) makes little sense. El Badrawi's reading, in which employment authorization necessarily includes the right to physically remain in the country, is a much more reasonable one. And with this interpretation clarified, it becomes clear that Manack and Loser lacked probable cause to arrest El Badrawi. El Badrawi's FTCA claim for false arrest/false imprisonment survives the government's Motion to Dismiss.

#### 2. *Abuse of Process*

■ Abuse of process creates liability for an individual who uses legal process

---

**28.** In *Zerrei v. Gonzales*, 471 F.3d 342 (2d Cir.2006), the Second Circuit cited *Teberen* for the proposition that an alien will be subject to removal as an overstay if he was admitted as a nonimmigrant for a temporary period, that period had elapsed, and the immigrant had not departed. *Id.* at 345. *Zerrei* is not on point because there is no evidence that the petitioner in *Zerrei* had submitted a timely application for extension of stay. Accordingly, the Second Circuit did not have occasion to consider how an extension application affected the alien's right to remain in the country.

**29.** It should be noted that even this regulation could be interpreted to authorize the person to remain in the United States. The regulation states that:

> Interim benefits will not be granted based on an application or petition held in suspense for the submission of requested initial evidence, except that the applicant or beneficiary will normally be allowed to remain

while an application or petition to extend or obtain status while in the United States is pending. USCIS may choose to pursue other actions to seek removal of a person notwithstanding the pending application. Employment authorization previously accorded based on the same status and employment as that requested in the current application or petition may continue uninterrupted as provided in [8 C.F.R. § 274a.12(b)(20)] during the suspense period.

8 C.F.R. § 103.2(b)(10)(ii). In light of the regulation's statement that applicants "will normally be allowed to remain," it is unclear whether "other actions to seek removal" refers merely to steps antecedent to the initiation of removal proceedings, or whether it refers to the actual initiation of removal proceedings themselves, all of course in the context of an incomplete application for extension.

against another individual "primarily to accomplish a purpose for which it is not designed." *Mozzochi v. Beck*, 204 Conn. 490, 494, 529 A.2d 171 (1987) (quoting Restatement (Second) of Torts § 682) (internal quotation marks omitted) (emphasis removed).

■ Insofar as El Badrawi brings suit based on his arrest and initial detention, the legal "process" he alleges was abused was the issuance of the warrant for his arrest.[30] In this regard, El Badrawi's Complaint does not allege facts sufficient to state a claim for abuse of process. In the immigration context, the purpose of an arrest warrant is to take an alien into custody, pending removal proceedings, in order to "[e]nsur[e] removal by preventing the alien from fleeing, and protect[ ] the community from further criminal acts or other dangers." 63 Fed.Reg. 27441, 27442 (May 19, 1998). El Badrawi's Complaint alleges that he was arrested because ICE officials had national security concerns about him. This surely falls in the category of "protecting the community" from criminal acts by the alien.[31]

El Badrawi's abuse of process claim does survive insofar as it is based on his post-voluntary-departure detention. That is because El Badrawi alleges that, once the government had agreed to allow him to voluntarily depart, the government nevertheless detained him without any legitimate immigration purpose. This is the very definition of the tort of abuse of process: immigration officials were using the legal process of immigration detention for reasons other than the reasons for which the detention was designed.

### 3. *Intentional Infliction of Emotional Distress*

■ In Connecticut, an individual is liable for intentional infliction of emotional distress when four elements are met: (1) the actor either intended to inflict emotional distress, or he knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's conduct was what caused the plaintiff's distress; and (4) the plaintiff sustained emotional distress that was severe. *Appleton v. Bd. of Educ.*, 254 Conn. 205, 210, 757 A.2d 1059 (2000). The government challenges El Badrawi's claim only on the second prong. *See* Federal Defendants' Mem. at 18–19.[32]

■ To fit the "outrageousness" prong, El Badrawi must point to conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

---

**30.** El Badrawi's Memorandum suggests that his abuse of process claim also targets the decision of INS officials to place him in removal proceedings. As discussed previously, this aspect of his claim is barred by 8 U.S.C. § 1252(g) because it challenges the commencement of removal proceedings against him.

**31.** It is of no moment to the abuse of process claim whether or not ICE officials had probable cause to arrest El Badrawi. The tort of abuse of process is concerned with the misuse of legal process, for a purpose other than what it was designed for, irrespective of whether or not the process was "obtained in the course of proceedings that were brought with probable cause." Restatement (Second) of Torts § 282 cmt. a.

**32.** To the extent that the government also presses an argument based on the first element, the court rejects that claim. To be sure, El Badrawi does not allege that Manack and Loser specifically intended to cause him emotional distress when they arrested and detained him. However, on the facts alleged, it is plausible to infer that they knew or should have known that emotional distress would be the likely result of their actions.

civilized community." *Appleton*, 254 Conn. at 210–11, 757 A.2d 1059 (quoting Restatement (Second) of Torts § 46 cmt. d) (internal quotation marks omitted). El Badrawi has done so here with regard to his initial arrest and detention. On the facts as alleged, Manack and Loser arrested El Badrawi and took him into custody, alongside a general prison population, even though they knew or should have known that he had committed no immigration violation. This is conduct that, if submitted to a factfinder, could be deemed sufficiently outrageous to state a claim under Connecticut law. *See id.* at 210, 757 A.2d 1059 (explaining that while the court acts as the initial gatekeeper on the outrageousness prong, the issue must be left to the factfinder where reasonable minds could disagree).

Similarly, El Badrawi has stated a claim for intentional infliction of emotional distress based on his post-voluntary-departure detention. Indeed, the court has previously concluded that the government's alleged conduct in this regard could be found to be conscience shocking. *See supra*, p. 270.

## V. EXPUNGEMENT CLAIMS AGAINST MUELLER, CHERTOFF, FBI, DHS

El Badrawi's final set of claims seek to expunge various inaccurate records. He has asserted these claims against various federal officials, sued in their official capacity, as well as various federal agencies.[33]

■ It is a well-established principle of law that the United States may not be sued without its consent. *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). This principle extends to claims for equitable relief, as well as claims for damages. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688–89, 695, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) (holding that a suit for injunctive relief against a federal officer, acting in his official capacity and within his statutory and constitutional authority, was barred by sovereign immunity). Accordingly, unless there is some federal statute that authorizes El Badrawi's expungement action, El Badrawi's expungement claims are barred.[34]

El Badrawi does not point to any such authority, and the court is aware of none.[35]

---

33. El Badrawi asserts that his expungement claims arise either under the NCIC statute or as a matter of federal common law.

34. The court notes that El Badrawi has merely claimed that the relevant records are inaccurate; he has not argued that maintenance of these records is unconstitutional. *Cf. Walker v. United States*, 116 F.R.D. 149, 151 (S.D.N.Y.1987) (allowing records to be expunged after the court concluded that it would be unconstitutional for the Bureau of Prisons to continue to maintain the records).

35. El Badrawi does not contend that the NCIC statute contains an express waiver of sovereign immunity. El Badrawi also has not relied on the Administrative Procedure Act (APA), which waives the government's sovereign immunity for claims seeking non-monetary relief when such claims assert that the United States or "an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702. The APA ultimately cannot help El Badrawi because it contains a proviso making clear that it does not "confer[ ] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* In this case, the Privacy Act impliedly forbids El Badrawi from obtaining relief. That statute provides a mechanism for individuals to sue to correct records that federal agencies maintain about them. *See id.* § 552a(g). However, the statute expressly limits the class of plaintiffs to individuals who are U.S. citizens and lawful permanent residents. *See id.* § 552a(a)(2). Accordingly, the Privacy Act implicitly (if not explicitly) forbids nonresident aliens like El Badrawi from suing federal agencies to correct their records.

Instead, El Badrawi relies primarily on several cases which have recognized a court's inherent authority, in certain very limited circumstances, to expunge *criminal* records in cases that had proceeded before that court. *See, e.g., Diamond v. United States,* 649 F.2d 496, 499 (7th Cir. 1981); *United States v. Schnitzer,* 567 F.2d 536, 539 (2d Cir.1977). In a criminal action, where the United States has already submitted itself to the court's jurisdiction by bringing suit, it is understandable why the court that heard that criminal action might be able to sidestep any immunity concerns. *Cf. Lapides v. Bd. of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 619, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002) (explaining that a state's voluntary appearance in federal court will waive its sovereign immunity under the Eleventh Amendment). Here, the United States has not affirmatively advanced litigation before this court regarding El Badrawi, and thus there is no reason to think that the government's immunity can be overcome.

To the extent El Badrawi relies on other cases that permitted expungement actions to proceed, the court does not find them persuasive because they did not fully discuss whether sovereign immunity barred the expungement action. *See, e.g., Tarlton v. Saxbe,* 507 F.2d 1116 (D.C.Cir.1974) (permitting an expungement claim to go forward under the NCIC statute, but not considering whether this statute effected a waiver of sovereign immunity); *Menard v. Mitchell,* 430 F.2d 486, 492 (D.C.Cir.1970) (permitting an expungement claim to go to

trial in federal court, without considering whether the claim survived an assertion of sovereign immunity, in a case where the FBI maintained records of an arrest by state authorities); *Doe v. Immigration and Customs Enforcement,* No. M–54, 2004 WL 1469464, at *2 (S.D.N.Y.2004) (relying on criminal case law to order the expungement of an immigration-related arrest record, without discussing issues of sovereign immunity).

El Badrawi's expungement claims are therefore dismissed for lack of jurisdiction.[36]

## VI. SUMMARY JUDGMENT MOTIONS

Thus far, the court's discussion of the issues has treated the federal defendants' pleadings as though they had simply filed a Motion to Dismiss. As such, the court was able to dismiss the claims against all federal defendants other than the United States, as well as some of the FTCA claims. However, because FTCA claims for false arrest/false imprisonment, abuse of process, and intentional infliction of emotional distress survive the Motion to Dismiss, the court must decide if the United States is entitled to summary judgment on these claims.

This issue is easily resolved. The court has reviewed the government's evidentiary submissions insofar as they are relevant to the claims remaining in this case. The court has also examined the government's Local Rule 56(a)(1) statements of undis-

---

**36.** The government has also argued that El Badrawi lacks Article III standing to bring this claim. Normally, the court would address that argument first, because courts may not assume that they have Article III jurisdiction. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 93–94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). However, when the United States asserts that its sovereign immu-

nity bars an action, that immunity assertion is jurisdictional. *See Mitchell,* 463 U.S. at 212, 103 S.Ct. 2961. A court may properly dismiss a claim for lack of subject matter jurisdiction, even mere statutory jurisdiction, without first assuring itself that it possesses jurisdiction under Article III. *See Lance v. Coffman,* 127 S.Ct. 1194, 1196 n. * (2007) (per curiam).

puted issues of material fact. With one exception, the court does not understand the United States to be advocating a version of the facts that would entitle it to summary judgment on the outstanding FTCA claims. Indeed, putting aside that one exception, the government's Motion for Summary Judgment is essentially coterminous with its Motion to Dismiss.

The one exception pertains to El Badrawi's FTCA claims based on his post-voluntary-departure detention. Manack and Loser both contend, through their declarations, that they had absolutely no involvement in El Badrawi's prolonged detention. Manack Dec. at ¶ 7; Loser Dec. at ¶ 10.

As El Badrawi points out, he has not yet had the opportunity to depose Manack and Loser about their involvement. Nor has he had the opportunity to pursue other discovery concerning Manack and Loser and his detention. Accordingly, the court deems it appropriate under Rule 56(f)(1) to **DENY** the United States's Motion for Summary Judgment, pending further discovery in the case.[37]

## VII. CONCLUSION

In light of the above, the state defendant's Motion to Dismiss [Doc. No. 19] is **GRANTED IN PART AND DENIED IN PART.** The official capacity RLUIPA claim against defendant Lee is dismissed, while the personal capacity claims against him remain. If El Badrawi wishes to amend his Complaint to assert a personal capacity RLUIPA claim, he has until **21 days after this Ruling** to file his amended Complaint.

The individual federal defendants' Motion to Dismiss [Doc. No. 22] is **GRANT-**

**ED.** All claims against defendants Manack and Loser are dismissed for failure to state a claim. The individual federal defendants' Motion for Summary Judgment [Doc. No. 35] is **DENIED AS MOOT,** and El Badrawi's Rule 56(f) Motion to Continue or Deny Defendants Manack and Loser's Motion for Summary Judgment [Doc. No. 44] is **DENIED AS MOOT.**

The other federal defendants' Motion to Dismiss [Doc. No. 25] is **GRANTED IN PART AND DENIED IN PART.** All claims against defendants DHS, FBI, Chertoff, and Mueller are dismissed for lack of subject matter jurisdiction. The FTCA claims against the United States for malicious prosecution and vexatious suit are also dismissed. The FTCA claims for false arrest/false imprisonment, abuse of process, and intentional infliction of emotional distress remain in the case to the extent discussed in the Ruling. The other federal defendants' Motion for Summary Judgment [Doc. No. 36] is **DENIED AS MOOT** insofar as it pertains to claims which the court has dismissed on the pleadings and **DENIED** otherwise. El Badrawi's Rule 56(f) Motion to Continue or Deny Defendants' Motion for Summary Judgment [Doc. No. 46] is **DENIED AS MOOT** insofar as it pertains to claims which the court has dismissed on the pleadings, and claims arising out of El Badrawi's arrest and detention before he agreed to voluntary departure, and **GRANTED** otherwise.

**SO ORDERED.**

---

**37.** Of course, even if Manack and Loser had no involvement in the detention, El Badrawi could still maintain his FTCA claim against the United States if he could show that there were other responsible federal officials, covered by the FTCA, who did commit the claimed torts.